RENDERED: OCTOBER 21, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NOS. 2021-CA-0344-MR AND 2021-CA-1241-MR

ALI AL-MAQABLH                                                 APPELLANT

|  |  |
|---|---|
| v. | APPEALS FROM TRIMBLE CIRCUIT COURT<br>HONORABLE DOREEN GOODWIN, JUDGE<br>ACTION NO. 14-CI-00054 |

LINDSEY JO ALLEY                                              APPELLEE

OPINION
AFFIRMING IN PART, REVERSING IN PART, VACATING IN PART, AND
REMANDING WITH RESPECT TO APPEAL NO. 2021-CA-0344-MR;
AFFIRMING WITH RESPECT TO APPEAL NO. 2021-CA-1241-MR

** ** ** ** **

BEFORE: GOODWINE, JONES, AND MAZE, JUDGES.

JONES, JUDGE: These two appeals were consolidated by order of the Court.

Both appeals were filed by Ali Al-Maqablh ("Ali") and arise out of the same

family court action. The appeals concern various rulings by the family court

division of the Trimble Circuit Court ("family court") relating to Ali's minor son,

E.M.A.A. ("Child"). The Appellee, Lindsey Jo Alley ("Lindsey") is Child's mother.

Appeal No. 2021-CA-0344-MR concerns the validity of the family court's August 24, 2020 *nunc pro tunc* order as well the family court's decisions regarding Child's custody, timesharing, and related matters which were set forth in a subsequent order that was also entered on August 24, 2020. With respect to this appeal, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

In Appeal No. 2021-CA-1241-MR, Ali challenges certain orders by the family court related to the Trimble Circuit Court Clerk's certification of the record in the first appeal. With respect to this appeal, we affirm.

## I. BACKGROUND

The parties have never agreed on how best to parent Child.[1] In fact, this action began even before Child was born when Ali filed an emergency petition with the family court alleging that Lindsey was endangering Child by her conduct during her pregnancy. Shortly after Child's birth in May 2014, Ali filed a motion

---

[1] Prior to Child's birth Ali and Lindsey participated in a religious marriage ceremony in Kentucky. Thereafter, they referred to one another as husband and wife for a period of time. However, for reasons that are neither relevant nor entirely clear from the record, a marriage certificate was never filed. At this juncture, there is no dispute that the parties were not legally married under Kentucky's statutory marriage laws. Kentucky Revised Statutes ("KRS") 402.100; *Pinkhasov v. Petocz*, 331 S.W.3d 285 (Ky. App. 2011).

requesting that Child's name be changed,[2] that Child be circumcised, and that Child's medical records be released to Ali. The parties' disagreements have not lessened over time.

Ali moved to have equal parenting time shortly after his paternity was conclusively established. In October 2014, when Child was approximately five months old, the family court granted Ali two hours of supervised visitation per week. In February 2015, Ali's parenting time was expanded to six hours of unsupervised visitation every Saturday. With the assistance of a private mediator, in May 2015, around the time of Child's first birthday, the parties signed an agreed order providing for a gradual expansion of Ali's parenting time until Child reached eighteen months.

As the eighteenth-month mark approached, the parties found themselves in a disagreement concerning how to interpret the agreed upon expansion of Ali's parenting time, requiring the family court to intervene.

---

[2] By order entered November 19, 2015, Child's name was ordered changed to include "Ali" as part of Child's surname. Ali was not satisfied with the family court's order insomuch as it did not grant him the exact relief he requested. As a result, he appealed the family court's order to this Court as a matter of right. This Court affirmed the family court, and the Supreme Court of Kentucky denied Ali's request for discretionary review. *Al-Maqablh v. Alley*, No. 2015-CA-001906-MR, 2017 WL 2332679 (Ky. App. May 26, 2017), *discretionary review denied* (Ky. Dec. 7, 2017). Ali then attempted to obtain further review from the United States Supreme Court, but his petition for writ of certiorari was denied as untimely. *Al-Maqablh v. Alley*, 138 S. Ct. 2016 (Mem), 201 L. Ed. 2d 245 (2018).

Ultimately, the family court ordered the parties to follow a rotating two-week schedule as follows:

> Beginning on December 17, 2016, [Ali] shall have overnight visitation from Saturday (12/17/16), at 10:00 a.m. to Sunday (12/18/16), at 11:00 p.m. The following week, [Ali] shall have parenting time on Tuesday 12/27/16, from 10:00 a.m. to 11:00 p.m. and then again overnight from Saturday 12/31/16 at 10:00 a.m. to Sunday (1/1/2017), at 11:00 p.m. The schedule shall continue on that bi-weekly rotation.

(Record ("R.") at 211.) The family court additionally laid out a detailed schedule for holidays and days of religious significance. Finally, the family court ordered that going forward "the parties must mediate all issues" before an agreed upon mediator prior to asking the family court to set their disputes for hearings. The only exception to the pre-mediation requirement was a motion for contempt for a clear violation of a valid court order. (R. at 214.)

On July 3, 2018, Ali filed a motion seeking to hold Lindsey in contempt of court for willfully violating the family court's standing order on visitation. Ali asserted that Lindsey had unjustifiably withheld Child from him depriving him of his timesharing. A hearing on Ali's motion was originally set for later that month but was rescheduled numerous times before ultimately taking place on December 12, 2018. Following a predictable pattern, by the time of the hearing, the parties' disputes had grown to include several other issues.

In compliance with the family court's order, the parties attempted to mediate their disputes prior to the hearing but did not reach a resolution. However, shortly before the December 12 hearing commenced, the parties reached an agreement on most areas of dispute. The parties' counsel informed the family court of the agreement at the start of the hearing. The family court then read the substance of the parties' agreement into the record.[3] The following day, December 13, 2018, the family court entered a written order stating: "agreed order read into the record this date. Parties acknowledge and understand agreement is binding on them. Counsel to prepare an agreed order and submit to the court." (R. at 268.) For reasons that are not entirely clear to this Court, no such order was ever filed with the family court.

Over the next several months, the animosity between the parties continued to fester and more motions were filed with the family court. In addition to the custody and timesharing issues raised by the current appeal, the parties disagreed on several other issues such as Child's medical care.[4]

---

[3] As will be discussed in more detail below, the family court did not read the agreement into the record verbatim.

[4] In light of the magnitude of the issues and the parties' continued inability to work together, the family court appointed Rebecca Smither to act as a Friend of the Court ("FOC") prior to the next scheduled hearing. On December 3, 2019, FOC Smither filed a detailed fifteen-page report with the family court. Therein, she addressed matters concerning custody, parenting time, education, and Child's general welfare. FOC Smither recommended that Child remain enrolled at Bedford Elementary in Trimble County and that timesharing be modified so that Child would reside with Lindsey during the school week and with Ali on the weekends, with the caveat that any such

Following a hearing on January 27, 2020, the family court entered a handwritten order on February 6, 2020, which resolved some but not all of the outstanding issues. Most importantly, the order did not address the location of Child's school, modification of timesharing, Ali's motion to hold Lindsey in contempt for enrolling Child in kindergarten in Trimble County, Lindsey's request for child support,[5] or Ali's request for permission to travel to the Hashemite Kingdom of Jordan ("Jordan") to visit family with Child.[6]

The next significant event occurred when the family court entered a pair of orders on August 24, 2020; these two orders are the subject of Ali's first appeal, Appeal No. 2021-CA-0344-MR. The first order, styled "*nunc pro tunc*

---

modification should be structured to avoid either parent losing significant parenting time. The report also addressed a plethora of other issues, most of which are not immediately relevant. While FOC Smither had initially recommended the parties retain joint legal custody, after receiving additional documentation from Ali, FOC Smither filed a revised/supplemental report with the family court. Therein, she observed that the additional documentation convinced her that "the parties are incapable of constructively working together for the benefit of their son." (R. at 312.) Most significantly, she deleted her recommendation for joint custody and replaced it with a recommendation "that the parties undergo a custody evaluation to determine the best interest of the child as to which parent should be making the educational and medical decisions for the minor child." (R. at 313.)

[5] The order did direct the parties to provide one another and the family court with all 2019 W2's, 1099's, or other income documentation, as well as copies of their 2018 and 2019 tax returns. Although not specifically mentioned, we presume this portion of the order was in contemplation of a future ruling on the child support issue.

[6] A prior order barred the parties from leaving the United States with Child without prior court approval; additionally, Ali would not be able to obtain a passport for Child without Lindsey's cooperation. *See* U.S. DEPARTMENT OF STATE – BUREAU OF CONSULAR AFFAIRS – CHILDREN UNDER 16, https://travel.state.gov/content/travel/en/passports/need-passport/under-16.html (last accessed Oct. 5, 2022).

order," was entered in response to the parties' failure to file an agreed order

following the December 12, 2018 hearing.[7]  It provides:

> This matter came before the Court on December 12, 2018.  During the hearing, an Agreed Order was read into the record.  Both parties acknowledged, on the record, that they agreed to the below provisions.  The parties were informed that the following order was at that moment an order of the Court.  This Court requested, through the Staff Attorney, on July 29, 2020, for the parties to provide a copy of the Agreed Order that was read into the record as one had never been filed.  Apparently following court, it was not signed.  However, what was submitted does not follow exactly what was read into the record.  Attorney Michael Slaughter in the hearing made references to certain numbered provisions that do not match up with what was provided.  The order that was read into the record also made references that the parties agreed to certain numbered provisions, but said provisions themselves were not read into the record.  Therefore, only those read into the record are hereby ordered as follows:
>
> 1.  That the parties will continue to have joint legal custody and substantially shared custody, of their minor child, [Child].
>
> 2.  The parties shall share parenting time on a two-week rotating schedule in accordance with the attached schedule.  Said schedule gives [Ali] six (6) overnights and [Lindsey] eight (8) overnights every two weeks.  This is considered substantially shared custody.

---

[7]  "When an order is signed '*nunc pro tunc*' as of a specified date, it means that a thing is now done which should have been done on the specified date."  *Wright v. Ecolab, Inc.*, 461 S.W.3d 753, 754 n.1 (Ky. 2015) (citation omitted).  "The rationale of *nunc pro tunc* orders is 'to record some act of the court done at a former time which was not carried into the record[.]'  Under Kentucky law, the power to act *nunc pro tunc* is inherent in the courts."  *Webster County Bd. of Educ. v. Franklin*, 392 S.W.3d 431, 437 (Ky. App. 2013) (quoting *Benton v. King*, 199 Ky. 307, 250 S.W. 1002, 1003 (1923)).

3.  [Ali] shall no longer have Muslim holidays but rather has elected to share Christmas and Easter.

4.  For 2018 and moving forward Christmas holiday shall be divided with [Lindsey] to have, in even years, Christmas Eve at 3:00 p.m. until Christmas Day at 3:00 p.m. and [Ali] to have Christmas Day at 3:00 p.m. to December 26th at 3:00 p.m.  In Odd years [Ali] to have Christmas Eve at 3:00 p.m. until Christmas Day at 3:00 p.m. and [Lindsey] to have Christmas Day at 3:00 p.m. to December 26th at 3:00 p.m.  For 2019 and moving forward the Easter holiday shall be divided with [Lindsey] to have, in all odd years, Saturday before Easter at 3:00 p.m. until Easter day at 3:00 p.m. and the [Ali] to have Easter at 3:00 p.m. until Monday after Easter at 3:00 p.m. Monday (or return to school Monday, if a school day).  In Even years [Ali] to have Saturday before Easter at 3:00 p.m. until Easter day at 3:00 p.m. and [Lindsey] to have Easter at 3:00 p.m. until Monday after Easter at 3:00 p.m. Monday (or return to school Monday, if a school day).

This Order is hereby entered *Nunc Pro Tunc* to December 12, 2018.

(R. at 398-99.)

The second order entered on August 24, 2020, attempted to resolve several of the remaining issues regarding custody, timesharing, and child support. It provides:

This matter was before the Court for a hearing on February 5, 2020[,] for numerous motions. . . .  The Court entered orders on multiple issues on February 6, 2020.  The parties were previously before the Court on December 12, 2018[,] where the parties' Agreed Order was read into the record.

-8-

The parties have a long and tumultuous history before the Court. Before the December 12, 2018 hearing, the parties came to an agreement and said agreement was read into the record with this Court repeating multiple times that once the hearing ended, the Agreed Order was an order of the Court. A separate [*nunc pro tunc*] order shall be entered [this date] memorializing the Order. The relevant part of the Agreed Order stated as follows:

> **"2. The parties shall share parenting time on a two-week rotating schedule in accordance with the attached schedule. Said schedule gives [Ali] six (6) overnights and [Lindsey] eight [8] overnights every two weeks. This is considered substantially shared custody."**

[Ali] filed a motion for contempt for [Lindsey] to show cause as to why she should not be held in contempt for enrolling the parties' son in Trimble County Schools without his consent. [Ali] alleged that the parties agreed to a provision stating, "that [Child] shall attend daycare at Kayfield Academy until Kindergarten at which time the parties shall agree upon a daycare that is convenient to the child's school as to make transportation possible." [Ali] alleges [Lindsey] enrolling the child in Trimble County school is a violation of this provision. However, that part was not read into the record nor did the parties ever submit an Agreed Order that included such additional provisions not read into the record, and therefore is not an Order of this Court and irrelevant as it does not relate to where the child attends school. Further, the minor child resides with [Lindsey] in excess of 50% of the time, therefore she is the primary residential parent for school purposes.

By all reports the minor child seems to be doing well at his current school, Bedford Elementary. There is no evidence it would be in his best interest for him to transfer schools to Jefferson County. On the contrary,

[Ali's] frequent moves could be problematic for the child's school location. For the foregoing reasons, [Ali's] motion for contempt for enrolling the parties' child in Trimble County Schools is DENIED. The Court orders the minor child shall remain in Trimble County schools.

At the hearing, [Ali] testified that it is an inconvenience for him to travel to Trimble County during his weekday parenting time to take the minor child to school. As such, [Ali] shall have the first, third, and fourth weekends of the month from Friday after school until Monday morning when he takes him to school or daycare. If he is unable to transport the child to school, he shall return him on Sunday at 6:00 p.m. [Lindsey] has all other times. This schedule excludes the holiday schedule previously ordered. His first weekend of the month shall fall on the first Friday in the month.

[Lindsey] filed a motion in September 2019 requesting [Ali] to pay child support to her. The Parties previously agreed that neither party would pay child support. [Ali] purports his income to be $1,256.00 per month but has provided zero proof of his income. However, no proof was provided or presented to dispute that he earns minimum wage. Therefore, the Court is left with no choice but to accept this sum. [Lindsey] works for Catholic Health Initiatives. Based on her three paystubs that she provided to the Court, the Court finds her gross monthly income to be $4,223.00. [Lindsey] also pays for the minor child to have dental, vision, and medical insurance for a total of $84.40 per month. Applying the child support guidelines, the Court finds that [Ali] shall pay to [Lindsey] $183.63 per month in child support effective September 2019.

[Ali] also filed a motion to allow his son to travel to Jordan with him. [Lindsey] objects to this travel. [Ali] has a history of frequent moves and not providing his address to [Lindsey]. For the foregoing reasons and

-10-

due to the global pandemic COVID-19, this Court believes it is not in the best interest of the child to travel outside of the United States. Therefore, [Ali's] motion is DENIED.

Prior to future litigation and issues regarding the child, the parties shall enlist the assistance of a parenting coordinator. The Court appoints Louis Winner as parenting coordinator.

This Order hereby modifies the *nunc pro tunc* Order entered [this date] as a result of portions of the Agreed Order read into the record and entered by the Court on December 12, 2018. Insofar as not modified herein, all other provisions of the December 12, 2018 order remain in full force and effect.

(R. at 394-96.)

On August 31, 2020, Ali filed two CR[8] 59.05 motions requesting the family court to alter, amend, or vacate both of the August 24 orders.[9] On February 22, 2021, the family court entered an order "resolving" the pending CR 59.05

---

[8] Kentucky Rules of Civil Procedure.

[9] Before these motions were ruled on by the family court, the parenting coordinator, Louis P. Winner, filed a recommendation wherein he addressed many of the parties' concerns with the schedule the family court ordered on August 24th. Specifically, Mr. Winner recommended that the family court revise its order to include that the parties would have equal parenting time during the summer, fall break, winter break, and spring break. By its order entered February 21, 2021, the family court adopted the recommendations by entering an order detailing how the parties were to share equal parenting time during Child's school breaks. The family court's order also provided a schedule for parenting time during Thanksgiving, Labor Day, Memorial Day, Halloween, and the Fourth of July. However, the family court left the provisions of the second August 24 order intact as it related to timesharing during the school year.

motions.[10] Ali then filed Appeal No. 2021-CA-0344-MR. In this notice of appeal, Ali stated that he was appealing the family court's *nunc pro tunc* order and the second August 24 order in their entirety, with the exception of the provision appointing a parenting coordinator, which appears in the second August 24 order.

In the process of certifying the record for Appeal No. 2021-CA-0344-MR, certain issues arose regarding what should be certified and sent to the Court of Appeals. First, Ali maintained that the circuit court clerk should not have certified the entire written record because he only designated certain filings to be included. Second, Ali sought to supplement the circuit court clerk's written record with emails and other correspondence between the family court judge, her staff attorney and/or counsel. The family court refused to order the circuit court clerk to certify anything other than the full written record as maintained by the circuit court clerk;

---

[10] We are unable to fully comprehend the family court's "disposition order." It provides as follows:

> The Court was advised that counsel for [Ali] and [Lindsey] would not be appearing and [Lindsey] had no objection to [Ali's] motion. In addition, the Court understands this resolves the motion to alter, amend or vacate under submission with the Court. Therefore, the Court takes no further steps on said motion.

(R. at 448.) We note that an amended order was not entered by the family court despite its reference to Lindsey not having an objection to Ali's motion. Additionally, Ali filed two CR 59.05 motions with the family court, one related to the *nunc pro tunc* order and the other related to the second August 24 order. It is unclear which of the two motions or parts thereof Lindsey did not object to or even whether her nonobjection related to the CR 59.05 motions. In any event, for purposes of assuring finality on appeal, we consider the family court's statement that it would take no further action as the functional equivalent of denying Ali's CR 59.05 motions as moot.

-12-

it likewise refused to order the circuit court clerk to add anything to its official written record. Ali's second appeal, Appeal No. 2021-CA-1241-MR, relates to the family court's orders regarding certification of the record.

## II. STANDARD OF REVIEW

We "review the family court's findings of fact under a clearly erroneous standard of review, giving due regard to the opportunity of the family court to judge the credibility of the witnesses." *Blackaby v. Barnes*, 614 S.W.3d 897, 900 (Ky. 2021). "If the findings of fact are supported by substantial evidence and if the correct law is applied, a family court's ultimate decision regarding custody will not be disturbed, absent an abuse of discretion." *Coffman v. Rankin*, 260 S.W.3d 767, 770 (Ky. 2008). "Abuse of discretion implies that the family court's decision is unreasonable or unfair. Thus, in reviewing the decision of the family court, the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion." *B.C. v. B.T.*, 182 S.W.3d 213, 219-20 (Ky. App. 2005) (footnote omitted). As always, we review pure questions of law *de novo*. *Mitchell v. Mitchell*, 360 S.W.3d 220, 221 (Ky. 2012).

## III. APPEAL NO. 2021-CA-0344-MR

This appeal concerns two separate orders both entered on September 24, 2020. The first of the two orders is the *nunc pro tunc* order. Ali argues both that (1) the family court lacked particular case jurisdiction to enter this order; and (2) alternatively, that even if the family court had jurisdiction, it abused its authority because the *nunc pro tunc* order does not accurately reflect the parties' entire agreement of December 12, 2018.

With respect to the second order of August 24, 2018, Ali argues that the family court abused its discretion by: (1) denying his motion to hold Lindsey in contempt of court; (2) ordering Child to continue his education in Trimble County; (3) designating Lindsey as Child's primary residential parent for school; (4) modifying his timesharing with Child during the school year; (5) ordering him to pay Lindsey child support in contravention of the parties' prior agreement; and (6) refusing his request to be permitted to travel with Child to Jordan.

We will begin our analysis by first considering the *nunc pro tunc* order because the validity of the *nunc pro tunc* order affects the outcome of many of the issues Ali raises regarding the family court's substantive rulings in the second order of August 24, 2020.

## A. The Nunc Pro Tunc Order

Ali argues the family court lacked jurisdiction to enter the *nunc pro tunc* order because it was a modification of the family court's December 13 order and was entered well beyond the ten-day limit specified in CR 59.05. However, CR 59.05 applies only to *final* orders. The December 13 order was clearly not intended to be final as it contemplated the filing and entry of a subsequent order memorializing the parties' agreement with the family court. Accordingly, the basis of Ali's jurisdictional argument is untenable. *See Bank of Danville v. Farmers Nat'l Bank of Danville*, 602 S.W.2d 160, 164 (Ky. 1980) ("Order was interlocutory and subject to change by the trial court at any time prior to the final adjudication.").

Second, we disagree that the *nunc pro tunc* order actually modified the December 13 order. The December 13 order incorporated by reference the parties' agreement as read into the record during the December 12 hearing. [11] In this way, it was intended as a placeholder order that would bind the parties until a formal agreed order signed by the parties and the family court was entered of

---

[11] We are authorized to consider, as part of the family court's December 13, 2018 order, what the family court "read into the record" during the December 12, 2018 hearing. Findings of fact and conclusions of law made orally by a trial court at a hearing may be reviewed by this Court on appeal if, as here, they were "specifically incorporated into a written and properly entered order." *Kindred Nursing Centers Ltd. P'ship v. Sloan*, 329 S.W.3d 347, 349 (Ky. App. 2010).

record.  Ultimately, however, the parties never filed an agreed order with the family court.

Prior to entry of the *nunc pro tunc* order, the only written order of record was the December 13 order.  That order, however, is limited to the agreement as read into the record on December 12.  Moreover, the December 12 order did not set out the parties' actual agreement in writing; instead, it merely incorporated by reference the parties' agreement as read into the record at the hearing.  A review of the video recording from the December 12 hearing reveals that only a portion of the parties' agreement was actually addressed on the record Specifically, during the December 12 hearing, the following discussions took place regarding the "agreed order":

> COURT:  Both parties are present today with counsel.
> And where do we stand at this point?
>
> ALI'S COUNSEL:  We mediated an agreement, your honor.  We went to mediation, that wasn't entirely successful.  Ken and I have attempted to mediate it after the mediation, and –
>
> COURT:  And you were more successful mediators than the mediator?  Is that what you're telling me?
>
> ALI'S COUNSEL:  Well, we were more successful today in the face of seeing your bench, your honor.
>
> COURT:  Okay.  Alright.

ALI'S COUNSEL:  So, the tendered order that Ken has sent to the court, along with an affidavit that's in a motion that he filed before today, I think –

LINDSEY'S COUNSEL:  Yes.  Do you have it?

COURT:  This is on the holidays?

ALI'S COUNSEL:  Well, it starts with "the parties will continue to have joint legal custody."  Uh, number one.

COURT:  Okay.  Alright.

ALI'S COUNSEL:  Yes.  We are going to, we agree to number one, everybody agrees to number one, with the addition of, of after "legal and substantially shared custody," instead of just "legal custody."  Um, there's an understanding that in "substantially shared custody" there would be no child support.  Number two, we have modified the date.

LINDSEY'S COUNSEL:  Uh, if I may, Mike, before we, uh, um, that um, we had said, um, that it was, the schedule, well, maybe you're gonna mention number two.  Go ahead, I'm sorry.

ALI'S COUNSEL:  Alright.  Number two, we've modified the parenting schedule so that it's, um, six days with [Ali], eight days with [Lindsey], and I, we have the schedule that we're presenting to the court.  Uh, basically, if, the advantage of this schedule is that the parties do not have to meet personally any longer.  The exchanges take place at the daycare or school.  Um, and in the schedule, it's set up in week one, week two, um, in week one, mom has the child all day Sunday and Monday, takes the child to school on Monday morning.  Dad picks up the child at school and keeps and returns the child Tuesday morning to school.  Mom has the child Tuesday afternoon, all day Wednesday, all day Thursday, returns the child to school on Friday morning, Dad picks

up the child Friday afternoon, keeps the child all day Saturday, all day Sunday, returns the child to school on Monday morning, Mom has the child Monday from school, all day Tuesday, returns the child to school on Wednesday morning, Dad has the child Wednesday afternoon, all day Thursday, returns to school on Friday morning, and then Mom has the child Friday afternoon and Saturday, and then we start back over with Sunday again.  And that's the schedule that we have agreed to, uh, that replaces number two in the tendered order.  Number three, um, the parties have agreed that the American holiday schedule will be followed, not the Muslim, the American holiday schedule.  And the schedule will be, the only, uh, except that the order that is currently in force for regular holidays will remain in force except for Christmas and Easter.  On Christmas, Mom will have the child on even-numbered years from Christmas Eve at 3 p.m., until Christmas Day at 3 p.m.  Dad will have the child Christmas Day from 3 p.m. until December 26th, 3 p.m.  Then, for Easter, Mom will have the child on the Saturday before, in odd-numbered years, Mom will have the child, uh, on the Saturday before Easter at 3, until Easter at 3, and then we'll have the child from three on Easter until the day after Easter.  And then the, uh, schedule reverses in the other years.  Um, that takes care of the holidays.  All of the, all of the agreements in paragraphs four through eleven and twelve are agreed to as written.  Um, I would add that in number five, when they talk about daycare, the parties are going to share equally in the cost of the daycare.  And in number six, when they talk about the physician and medical bills, the parties will share equally in the cost of the medical bills and everything else, I think remains as written here.

LINDSEY'S COUNSEL:  Judge, uh –

COURT:  Hang on just one second.  Okay.

-18-

LINDSEY'S COUNSEL:  Uh, just, um, to just kind of clarify, or make sure we're on the same page, uh.  In addition to part of the holidays, any reference to the Muslim holidays come out, I mean –

ALI'S COUNSEL:  I agree.

LINDSEY'S COUNSEL:  Right, right.  The, since we are sharing, um, all expenses, I mean, I think that that should include the health insurance premium, the portion for Ali, I mean for [Child].  The, um, and, as well as any, um, agreed upon extracurricular –

ALI'S COUNSEL:  Extracurriculars, yeah.  Those would be standard in the shared custody plan anyway.

LINDSEY'S COUNSEL:  Right.  Um.  And, um, and we would, we want, Judge, I'm, if you want, I've got an order that's pretty close, I'm okay with submitting it, doing this and submitting this if you want me to.

COURT:  Okay.

LINDSEY'S COUNSEL:  Um, we, we've agreed no disparaging remarks –

ALI'S COUNSEL:  That's number –

LINDSEY'S COUNSEL:  Is it in there?

ALI'S COUNSEL:  Ten.

LINDSEY'S COUNSEL:  Okay.  Yes, there we go.  Absolutely.  Um.  And, um.

ALI'S COUNSEL:  Number eleven is respectful communication.

LINDSEY'S COUNSEL:  Yeah.  Alright.  So.

COURT:  Alright.  Let me, um, have both parties raise your right hand.  Do you swear or affirm that the testimony that you provide today will be the truth, the whole truth, and nothing but the truth?

ALI:  Yes, your honor.

LINDSEY:  Yes.

COURT:  Okay.  You've heard what was stated here in the court by counsel.  As far as what you all have agreed to, do you acknowledge that that's what your, your understanding of the agreement is?

ALI:  Yes, Judge.

COURT:  Do you understand that that's your agreement today?  Um, are you all going to submit something today in writing, or are you gonna put something together and have it circulate and let everyone sign it and tender it to the court?

ALI'S COUNSEL:  Ah, why don't you just tender it to the court with the understanding that we have agreed to it on the record so, like, you don't have to circulate it?

LINDSEY'S COUNSEL:  Why don't I, why don't I have you sign it, I'll send it to you, and that way we don't have to have them come in to, well, it's on the record and then, you and I'll sign it and I'll submit it to the court.  Or do you, you can, I –

ALI'S COUNSEL:  Or actually, if you send it to me, I'll file it with the court because it's convenient, more convenient, it's easier for me to file it than you since I live out here.

LINDSEY'S COUNSEL:  Okay.  Do you wanna file it electronic?  We can file it electronic.  We'll get it, we'll get our –

COURT: Do you want to hang on to this?

LINDSEY'S COUNSEL: I've got a copy. Yeah.

COURT: Alright. So, that's gonna be submitted. Now, you all understand that when you leave here today, that's the order of the court now. You've, it's been read into the record and acknowledged. Even though you don't have the entered order in your hands, it is an order of the court from this moment forward that you all are to follow.

ALI: Yes, your honor.

COURT: So, your counsel will put that in the form of, um, I guess this'll be –

ALI'S COUNSEL: Do you want an agreed order?

COURT: Become an agreed order, but it'll be, uh, what was prepared will be modified according to what you all agreed to today, and counsel, your counsel will sign it, I will allow that. I do prefer that the parties sign –

LINDSEY'S COUNSEL: Okay, you do. Okay. We can do that, that's not a problem.

COURT: If you're able to do that, I do prefer it because then I know that they've, I trust attorneys, but I feel like that means the party has a little more meat in the action if they've looked at it.

LINDSEY'S COUNSEL: Okay.

ALI'S COUNSEL: Good idea.

COURT: Um, and they'll submit it to the court, but I want you to know because some people were confused about that. Walking out this door, it's an order of the court, and you're bound by those terms as of today.

ALI:  Yes, your honor.

LINDSEY'S COUNSEL:  Uh, and Judge, just to, uh, I think we already agreed here but to clarify, we are now on, uh, today is Wednesday of "week one."

ALI'S COUNSEL:  Yes, this is "week one."

COURT:  Wednesday of "week one."  Today.

LINDSEY'S COUNSEL:  And, Judge, off, this, this would, um, this also, this takes care of all motions pending before this court.

ALI'S COUNSEL:  Yes.

LINDSEY'S COUNSEL:  Any contempts, motions to modify, anything and everything.

ALI'S COUNSEL:  You can add that in.

COURT:  Alright.  And that's your all's understanding as well?  Everything, this resolves anything that's outstanding right now.  Alright?  Very good.  Anything else that needs to be addressed?

ALI'S COUNSEL:  No, your honor.

COURT:  Alright.

Try as we might, we cannot find any written order in the record which includes a provision regarding where Child would be enrolled in school.  Although Ali asserts that the written agreed order presented to the family court during the December 12, 2018, hearing included such a provision, that "agreement" was not entered into the record on the date of the hearing, and the parties never filed a

signed agreed order with the family court thereafter.  While the December 13 order incorporated by reference the agreement as read into the record during the December 12 hearing, the portion of the agreement read into the record by the family court did not include anything about where Child was to attend school.

Ali's argument that the *nunc pro tunc* order should have included the portion of the parties agreement regarding the location of Child's primary school is not well founded where neither the oral nor written record contains a reference to any such agreement.[12] As eloquently explained almost a century ago,

> The office of a judgment *nunc pro tunc* is to record some act of the court done at a former time which was not carried into the record, and the power of the court to make such entries is restricted to placing to record evidence of judicial action which has been actually taken. ***It may be used to make the record speak the truth, but not to make it speak what it did not speak but ought to have spoken.***  Hence a court in entering a judgment *nunc pro tunc* has no power to construe what the judgment means, but only to enter of record such judgment as had been formerly rendered, but which had not been entered of record as rendered.

*Benton*, 250 S.W. at 1003 (emphasis added).

Ali's remaining arguments concerning the *nunc pro tunc* order also relate to alleged inconsistencies with the parties' agreement as it was read into the

---

[12]  In fact, even the unsigned agreed order later appended as an exhibit to the parties' motions references only where Child was to attend daycare, there is no mention in the draft order regarding where Child was to attend primary school.

record on December 12. We will not address each alleged inconsistency; suffice it to say, we have reviewed all of Ali's arguments in light of both the December 13 order and the record from the December 12 hearing and find no merit to these arguments. The *nunc pro tunc* order conforms to the portions of the agreement that were read into the record on December 12. We cannot appreciate any material deviation that rises to the level of an improper modification. While it may be that the entire agreement should have been read into the record on December 12, 2018, it was not. Simply put, the family court could not use the *nunc pro tunc* order to "speak what it did not speak but ought to have spoken." *Id.* It was only allowed to include what was actually addressed on the record during the December 12 hearing into the order. Having reviewed the record, we are confident that the *nunc pro tunc* order accurately encapsulates the parties' agreement as it was addressed on the record during the December 12, 2018 hearing. Accordingly, we find no basis upon which to set aside the family court's *nunc pro tunc* order.

### B. Second Order of August 24

The family court's *second* August 24 order made a number of modifications to the *nunc pro tunc* order and adjudicated a number of issues that had arisen between the parties since December 2018: (1) the family court determined that Lindsey could not be held in contempt for enrolling Child in school in Trimble County because there was never a valid order in place regarding

where Child was to be enrolled once he reached school age; (2) Child was to remain enrolled in Trimble County; (3) Lindsey would be designated Child's primary residential parent for school purposes; (4) timesharing would be modified such that Child would reside primarily with Lindsey during the school week and Ali would have timesharing every other weekend from Friday evening to Monday morning; (5) Ali shall pay $183.63 per month in child support to Lindsey effective September 2019; and (6) Child shall not be permitted to travel to Jordan with Ali.[13] Ali takes issue with each of these rulings.

**Contempt.** The trial court did not err when it overruled Ali's motion to hold Lindsey in contempt for failing to enroll Child in kindergarten in Jefferson County. "[O]nly if the party has violated a court order or rule may a contempt sanction be issued by the court." *Getty v. Getty*, 581 S.W.3d 548, 568 (Ky. 2019). As established above, there was no valid, written order regarding where Child was to be enrolled in school. A party cannot be held in contempt for violating an order

---

[13] This order resulted from a February 6, 2020 hearing in which the family court considered motions and evidence from the parties relating to further developments in this case affecting the overarching issues set forth above. At the hearing, the family court considered motions filed by Lindsey on September 18, 2019, to: (1) be designated primary residential parent during Child's school year; (2) be designated as Child's primary educational decision-making parent; (3) modify and reduce Ali's timesharing to every other weekend during the school year; and (4) determine child support and a division of child-related expenses. The family court also considered: (1) a September 30, 2019 motion, filed by Ali, to hold Lindsey in contempt for unilaterally enrolling Child in kindergarten at Bedford Elementary, a school located in Trimble County – as opposed to a school in Jefferson County; and (2) Ali's additional motion to allow Child to travel with him to Jordan.

that was never entered. *C.S. v. Commonwealth*, 559 S.W.3d 857, 867 (Ky. App. 2018).

**Location of Child's School.** Ali and Lindsey share joint legal custody of Child. "A significant and unique aspect of full joint custody is that both parents possess the rights, privileges, and responsibilities associated with parenting and are expected to consult and participate equally in the child's upbringing." *Pennington v. Marcum*, 266 S.W.3d 759, 764 (Ky. 2008). When, as in this case, the joint custodians cannot agree, the decision falls to the family court.

> [T]he [family] court, with its continuing jurisdiction over custody matters, must conduct a hearing to evaluate the circumstances and resolve the issue according to the child's best interest. Once the parents have abdicated their role as custodians to the trial court, its decision is binding on the parties until it is shown that the decision is detrimental to the child physically or emotionally, or is no longer in his best interest.

*Burchell v. Burchell*, 684 S.W.2d 296, 300 (Ky. App. 1984).

In this case, it was quite clear the parties had reached an impasse regarding where Child should attend school. The family court took its role quite seriously, going so far as to appoint an FOC to make recommendations as well as holding a hearing at which the parties testified. Ultimately, the family court concluded that it was in Child's best interest to remain enrolled in school in Trimble County. To this end, the family found that Child was currently enrolled in Trimble County, Child was doing well there, and Lindsey had a stable residence in

Trimble County. In contrast, the family court noted that Ali moved frequently, making Child's school location in Jefferson County somewhat tenuous.

While it is clear that Ali disagrees with the family court's decision and believes that a school in Jefferson County would be better for Child, mere disagreement alone is not a sufficient basis upon which to attack the family court's decision. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). The family court exercised its "tie breaking" authority appropriately; and its findings are supported by substantial evidence of record.

**Primary Residential Parent.** Ali next takes issue with the family court's reference to Lindsey as the "primary residential parent for school purposes." The family court's order in its present form does not vest Lindsey with any additional decision-making authority as related to Child's education.[14] Rather,

---

[14] As we explained in *Carver v. Carver*, 611 S.W.3d 750, 755 (Ky. App. 2020), "one parent may be designated the 'primary residential parent,' a term that is commonly used to denote that the child primarily lives in one parent's home and identifies it as his home versus 'Dad's/Mom's' house." (Quoting *Pennington*, 266 S.W.3d at 765.) By itself, designating one party as the primary residential parent does not affect shared/joint legal custody. *Id.* However, a court can include additional provisions vesting the primary residential parent with sole decision-making authority as to certain areas as part of its designation. *Id.* However, this would amount to a custody modification and require the family court to first determine that there had been a change of circumstances since entry of the order awarding the parties joint custody. *Id.*; KRS 403.340(3) ("[T]he court shall not modify a prior custody decree unless after hearing it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child."). In this case, the family court only discussed the best interest factors in relation to geography, *i.e.*, where Child would be enrolled in school and primarily live during the school year. The order did not give Lindsey sole decision-making authority over Child's education with

it appears that the family court was simply designating Lindsey as child's primary residential parent for the purpose of determining *where* Child would attend school and *where* Child would primarily reside during the school year.

The prior timesharing order did not designate either party as Child's primary residential parent. The subsequent designation of one parent as the primary residential parent without a corresponding change in decision-making authority is considered a modification of timesharing. *Pennington*, 266 S.W.3d at 769. As this case hinges on modification of timesharing, not custody, it falls under the purview of KRS 403.320. This statute states that timesharing may only be modified upon a proper showing that "modification would serve the best interests of the child[.]" KRS 403.320(3). The family court noted that Child lived with Lindsey the majority of the time[15] and that her home was much closer to Child's school than Ali's residence. These factors support the family court's designation of Lindsey as the primary residential parent for school purposes.

_____

respect to what classes he would take, what extracurricular activities he would participate in, or the myriad of other decisions that arise throughout the course of a child's education.

[15] Even prior to the modification of Ali's timesharing, the parties had a 60/40 arrangement with Child residing with Lindsey primarily during the school week. The majority of Ali's forty percent of the timesharing occurred on the weekends. Thus, even though we are vacating and remanding the family court's modification of Ali's timesharing, we do not believe this requires vacating the family court's designation of Lindsey as the primary residential parent for the purposes of Child's school. Of course, depending on how the family court resolves the timesharing issue on remand, it may, in its discretion, revisit its primary residential designation so long as any modification is supported by an appropriate best interest analysis.

**Modification of Ali's Timesharing.** Ali's next argument concerns the family court's decision to modify Ali's timesharing from a 60/40 split to one in which he only has timesharing with Child nine days per month during the school year. As set forth above, modification of timesharing is governed by KRS 403.320(3), which requires the modification to be in the child's best interests. The only justification cited in the family court's order for making this modification is that "it is an inconvenience for [Ali] to travel to Trimble County during his weekday parenting time." Prior to the order at issue, Ali was entitled to six overnights (consisting mainly of weekends) and Lindsey was entitled to eight overnights (consisting of weekdays) every two weeks. During the February 6, 2020 hearing, Lindsey explained the upshot of her motion to modify timesharing: she desired more weekend time with Child because, in her view, being the weekday parent cast her in the role of the "taskmaster" parent, rather than the "fun" parent.

During the hearing, Ali agreed to modify timesharing to allow Lindsey one weekend per month; provided, however, that he was given a commensurate amount of weekday timesharing. While Ali had testified that traveling to Trimble County was an inconvenience for him, he never indicated that he was unwilling to do so during the week. Most problematic, however, is that nowhere in the order at issue does the family court evaluate timesharing

modification in terms of *Child*'s best interests.[16]  Ali's convenience, or lack

thereof, is not one of the best interests factors.  While we could perhaps surmise or

imply various reasons the family court might have had for determining

modification of timesharing was in Child's best interests, this is not our role.  "To

conclude an implied ruling by a trial court was sufficient would clearly run afoul of

the mandates of CR 52.01[.]"  *Moore v. Moore*, 626 S.W.3d 535, 539, n.5 (Ky.

2021).  Therefore, we vacate this aspect of the family court's decision and remand

with directions for the family court to evaluate Lindsey's request to modify

timesharing during the school year in accordance with the best interests of Child.

Any subsequent order modifying timesharing shall include specific written

findings of fact and conclusions of law regarding *Child's best interests*.  In light of

---

[16]  In addressing a modification of timesharing issue, CR 52.01 "requires that the judge engage in at least a good faith effort at fact-finding and that the found facts be included in a written order. Failure to do so allows an appellate court to remand the case for findings, even where the complaining party failed to bring the lack of specific findings to the trial court's attention." *Anderson v. Johnson*, 350 S.W.3d 453, 458 (Ky. 2011).  In her brief, Lindsey asserts that the family court "made the appropriate findings in the best interest of the child" because "[t]he Order of February 22, 2021 specifically referred to the recommendations of the friend of the Court and the Court Appointed Parenting Coordinator and stated that she was following those recommendations."  First, there is no reference to any recommendations from the FOC in the family court's February 22, 2021 order.  Second, the FOC did not recommend or otherwise endorse – either during the February 6, 2020 hearing or in her report of December 3, 2019 – reducing Ali's timesharing by one weekend per month; rather, her recommendation, as set forth in her report, was to the contrary.  In fact, the FOC highlighted that she "wishe[d] to make clear that [her] recommendation does not suggest Ali only have parenting time every other weekend from Friday to Sunday."  Lastly, Mr. Winner, the parenting coordinator whose recommendations were adopted in the family court's February 22, 2021 order, made no comment upon whether altering the parties' pre-August 24, 2020 timesharing arrangement was in Child's best interests.

-30-

the passage of time, we leave it up to the family court to determine whether to make the required findings based on the record as it existed at the time, or to hold a supplemental evidentiary hearing.[17]

**Child Support.** Next, Ali claims the family court erred in ordering him to pay Lindsey child support. First, he asserts Lindsey's motion for child support should have been denied because it was substantially noncompliant with FCRPP[18] 9(4). Second, he emphasizes the family court recognized in its second August 24 order that he and Lindsey had "previously agreed that neither party would pay child support." Considering these factors, he argues the family court's award of child support, without reference to KRS 403.213, and with no express finding of a substantial and continuing change in circumstances, constitutes "plain error."[19]

While we are cognizant that Lindsey's motion did not substantially comply with FCRPP 9(4), there is no need for us to dwell on the effect, if any, this has on the family court's ultimate award because the more important issue is that, regardless of how the matter came before the family court, it was still required to

---

[17] Such a hearing could well eliminate or reduce future motions to modify as it would capture the parties' situations as they presently exist and not as they existed over two years ago.

[18] Kentucky Family Court Rule of Procedure and Practice.

[19] "Plain error review" is the federal equivalent to our "palpable error" review standard. *See McElroy v. Commonwealth*, 389 S.W.3d 130, 136 (Ky. App. 2012). We presume that Ali's reliance on this standard is his way of admitting that he did not preserve these arguments below.

follow KRS 403.213 before ordering a modification of child support. The family court's failure to do so in this case amounts to palpable error.

The facts before us parallel those in *Martin v. Cabinet for Health and Family Services*, 583 S.W.3d 12 (Ky. App. 2019). In *Martin*, divorcing parents entered into a separation agreement providing that neither party was required to pay child support. That agreement was incorporated into the decree. Thereafter, the Cabinet (which was the assignee of the mother's right to seek child support) filed a post-decree motion for initial child support rather than modification of child support. The matter was pleaded and adjudicated as an initial award of child support rather than a modification of child support pursuant to KRS 403.213. The Cabinet was awarded child support on the mother's behalf.

On appeal, this Court found that the incorporation of the separation agreement into the decree constituted an award of child support – albeit in the amount of zero. As such, we determined that the Cabinet's subsequent effort to seek child support should have been pleaded and adjudicated pursuant to the child support modification statute, KRS 403.213. We vacated the award of child support and dismissed the complaint without prejudice because: (1) the underlying matter was not pleaded or adjudicated pursuant to KRS 403.213; (2) the circuit court had made no finding, pursuant to KRS 403.213(1), "of a material change in

-32-

circumstances that is substantial and continuing" justifying modification; and (3) there was no evidence of changed circumstances. *Martin*, 583 S.W.3d at 20.

As in *Martin*, Lindsey and Ali entered an agreement providing that neither party was required to pay child support, and their agreement was incorporated into an order.[20] Thus, any modification of that award was required to be brought pursuant to KRS 403.213. *Martin*, 583 S.W.3d at 18. Similarly, neither the Cabinet in *Martin* (acting on behalf of the mother), nor Lindsey moved for modification pursuant to KRS 403.213. As in *Martin*, the family court here made no finding of changed circumstances.

---

[20] The portion of the parties' agreement, read into the record during the December 12 hearing and as incorporated by reference into the family court's December 13 order, included the parties' agreement that going forward there would be no child support owed by either party. Specifically during the hearing, when going over the parties' agreement, Ali's counsel addressed custody and child support as follows:

> ALI'S COUNSEL: Well, it starts with "the parties will continue to have joint legal custody." Uh, number one.
>
> COURT: Okay. Alright.
>
> ALI'S COUNSEL: Yes. We are going to, we agree to number one, everybody agrees to number one, with the addition of, of after ***"legal and substantially shared custody," instead of just "legal custody." Um, there's an understanding that in "substantially shared custody"*** there would be no child support. Number two, we have modified the date.

(Emphases added.) The family court's *nunc pro tunc* order mirrored the "substantially shared custody" language, which the parties agreed during the December 12 hearing encompassed their agreement that "there would be no child support." Specifically, the *nunc pro tunc* order states: "1. That the parties will continue to have joint legal custody and ***substantially shared custody***, of their minor child, [Child]." (Emphasis added.)

Furthermore, the record before us does not show that evidence of changed circumstances was adduced in conjunction with Lindsey's motion, much less considered. Attempting to rebut this point, Lindsey asserts that the following could be construed as such evidence: (1) at the February 6, 2020 hearing, Ali testified that he had started a new job; (2) pursuant to the family court's second August 24, 2020 order, Ali now has less timesharing with Child; and (3) she contended, as set forth in her September 18, 2019 affidavit, that Ali was not obeying their agreement to equally split Child's expenses.

Regarding her first point, nothing indicates Ali was earning *more* money at his new job. Ali was employed on December 13, 2018, when the family court first incorporated the parties' agreement of no child support into its order. When the family court directed Ali to pay child support on August 24, 2020, its order to that effect recognized he was at most making minimum wage. As to Lindsey's second point, it is moot because we have vacated that aspect of the family court's judgment. Regarding her third point, assuming it is true, a party's willful disobedience of a valid court order is easily rectified with a contempt citation. Thus, it cannot be considered "a material change in circumstances that is substantial and continuing[,]" per KRS 403.213(1).

Lastly, we agree with Ali that the family court's error was palpable, and thus subject to review despite its lack of preservation. *See* CR 61.02. We have

-34-

deemed this type of error as palpable before; and although our opinion to that effect was unpublished, we see no reason to depart from its persuasive reasoning.[21] Accordingly, we reverse the family court's award of child support and direct the family court to dismiss Lindsey's claim without prejudice.

**Ali's Request for Permission to take Child to Jordan.** The final issue Ali raises in his first appeal is his contention that the family court erred in denying him permission to take Child with him on an international excursion to Jordan at some indeterminate point in the future. The family court determined that such a trip was not in Child's best interests at that time due to the COVID-19 pandemic and because of Ali's past practice of refusing to inform Lindsey of his whereabouts or contact information. We cannot disagree with the family court's decision that the pandemic, which was still in its first year at the time of the order, made international travel too risky at that time and was not in Child's best interests. Likewise, the family court appropriately considered Ali's history of failing to keep Lindsey apprised of his residence. It was fair for the family court to assume that, if Ali was not willing to share his location in Jefferson County, he might be similarly unwilling to share with Lindsey the details of the trip to Jordan.

---

[21] *See King v. King*, No. 2021-CA-0009-MR, 2022 WL 258595 (Ky. App. Jan. 28, 2022) (unpublished; cited herein for consideration pursuant to CR 76.28(4)(c)).

We would be remiss if we did not also point out that Ali was essentially seeking a carte blanche order that would allow him to take Child to Jordan whenever he desired to do so without providing any specifics about the trip such as its date, its length, travel arrangements, contact information for Ali's family in Jordan, or the location and contact information where Ali and Child would stay. The lack of such specifics prevented the family court from being able to conclude that the trip would be in Child's best interests.[22]

## IV. APPEAL NO. 2021-CA-1241-MR

Ali's second appeal concerns the Trimble Circuit Clerk's certification of the appellate record as part of his first appeal. He asserts that by certifying the record as it existed in its then-current form, the clerk improperly acted contrary to a "designation of the record" he filed on April 27, 2021, insomuch as it included

---

[22] Even if Ali provides more specific details in the future, it does not mean that the family court must allow the trip. Ali must recognize that while international travel has many benefits, there are risks that the family court must weigh against the benefits, especially in light of Child's relatively tender age. One such risk could include the fact that "[t]he Hashemite Kingdom of Jordan is not a party to the Hague Convention on the Civil Aspects of International Child Abduction, nor are there any international or bilateral treaties in force between Jordan and the United States dealing with international parental child abduction." *See* U.S. EMBASSY IN JORDAN – INTERNATIONAL PARENTAL CHILD ABDUCTION, https://jo.usembassy.gov/u-s-citizen-services/international-parental-child-abduction/ (last accessed Oct. 5, 2022). Other courts considering this issue have determined that, while Hague Convention status is not dispositive, it is a relevant factor. *See Moore v. Moore*, 349 P.3d 1076, 1080 (Alaska 2015) ("In determining whether to limit foreign visitation, the trial court may look to a number of factors, including whether proposed countries of visitation are Hague Convention signatories. But this factor is not dispositive given the broad discretion accorded to trial courts in custody determinations."). In essence, this inquiry is highly fact specific. Here, the family court did not have to conduct such an analysis due to the pandemic and the fact that Ali's request was utterly lacking in specifics.

information Ali had not designated and omitted information he sought to have added to the written record.

Ali first explains that his "designation of the record" directed that only *part* of the original record on file in the clerk's office should be designated as the record on appeal. Specifically, he directed the clerk to omit every part of its record predating July 3, 2018; and to only include specific orders and other filings of his choosing following that date.[23] Disregarding his directive, the clerk's certification of the record on appeal included the *entirety* of its record – which began on May 20, 2014, when the underlying family court proceedings between Ali and Lindsey were initiated. Ali moved the family court to compel the clerk to certify the appellate record according to his designation, a request the family court denied.

We begin with CR 75.07; it provides in relevant part:

> (1) The clerk of the trial court shall prepare and certify the entire original record on file in his or her office, in accordance with the requirements of paragraphs (10) and (11) of this Rule 75.07, including the designations or stipulations of the parties with respect to proceedings stenographically or electronically recorded and a certified copy (rather than the original) of the docket assigned to the action, but excluding depositions not read into evidence.

---

[23] Ali's April 27, 2021 "designation of the record" included an itemized list of forty or so documents and orders filed in the clerk's office that he wished to comprise the entirety of the record on appeal, as well as instructions for the clerk regarding how these documents should be "marked."

(2) *The transcript of proceedings stenographically recorded (or tapes or recordings of proceedings electronically recorded), or such lesser portions thereof as have been designated* or agreed upon by stipulation, shall when filed with the clerk be certified as a part of the record on appeal.

(3) Except for (a) documents, (b) maps and charts, and (c) other papers reasonably capable of being enclosed in envelopes, exhibits shall be retained by the clerk and shall not be transmitted to the appellate court unless specifically directed by the appellate court on motion of a party or upon its own motion.

(4) The written record on appeal shall include the juror strike sheets made pursuant to RCr 9.36.

(5) *The matter certified under subsections (1), (2), (3), and (4) of this Rule and Rule 98 shall constitute the record on appeal.*  It is the responsibility of the appellant or counsel for the appellant, if any, to see that the record is prepared and certified by the clerk within the time prescribed by Rule 73.08.

. . . .

(10) *All parts of the written record on appeal shall be arranged in the order in which they were filed or entered.*  If the record comprises more than 150 pages, it shall be divided into two or more volumes not exceeding 150 pages each. Each volume shall be securely bound at the left side.

(11) There shall be a general index at the beginning of the record and an index to each volume in the front thereof which shall show, in the order in which they appear, the pages on which all pleadings, orders, judgments, instructions, and papers may be found, together with the name of each witness and the pages on which his or her examination and cross-examination

> appear.  All exhibits filed with the record shall be sufficiently identified and the index shall direct where they may be found.

*Id.* (emphases added).

While the entire written record must be certified by the circuit court clerk, the parties must designate any *untranscribed material*s they want included in the record.  CR 75.01.  As related to this case, such materials would primarily consist of the electronic recordings of the various court hearings.  *Id.*  CR 75.05's prohibition against the inclusion of "any matter not essential to the decision of the questions presented by the appeal" is directed at these untranscribed materials, not to the written record maintained by the circuit court clerk, which should be certified in its entirety as part of every appeal.  *Johnson v. Maloney's of Olive Hill, Inc.*, 569 S.W.2d 704, 706 (Ky. App. 1978) ("CR 75.07(1) now mandates that the appellate record shall contain the original record on file in the circuit clerk's office plus the designations of the parties."); *Seale v. Riley*, 602 S.W.2d 441, 443 (Ky. App. 1980) (emphasis added) ("*The clerk's original record is always included in the record on appeal*; the transcript of evidence or proceeding stenographically reported and depositions are included only when specifically designated.").

The family court rightly refused to direct the circuit court clerk to certify the written record as designated by Ali.  Pursuant to CR 75.07, the circuit

-39-

court clerk was required to certify the entire written record notwithstanding Ali's attempted "designation" to the contrary.

Next, Ali asserts the clerk of court and the family court improperly refused to supplement the written record to include various emails between counsel, the family court judge's staff attorney, and the family court judge. None of what Ali requested is contemplated by CR 75.07. Additionally, to the extent Ali maintains such documents would have shown judicial bias, we note he did not timely seek recusal of the family court judge, thereby waiving any such argument on appeal.[24] *Taylor v. Carter*, 333 S.W.3d 437, 445 (Ky. App. 2010).

## V. CONCLUSION

Based on the foregoing, with respect to Appeal No. 2021-CA-0344-MR:

(1) we affirm the family court's August 24, 2020 *nunc pro tunc* order in its entirety;

(2) we affirm the portions of the family court's second order of August 24, 2020, relating to the denial of Ali's motion to hold Lindsey in contempt, the location of Child's school (Trimble County), the designation of

---

[24] We note, however, that attorneys routinely communicate with staff attorneys and other personnel regarding ordinary scheduling matters. This type of communication is not considered unauthorized *ex parte* communication and would not serve as a valid basis to seek recusal of the family court judge.

Lindsey as Child's primary residential parent for school purposes, and the denial of Ali's request to be permitted to travel to Jordan with Child at some unspecified future date;

(3) we reverse the portion of the family court's second order of August 24, 2020, relating to child support;[25] and

(4) we vacate the portion of the family court's second order of August 24, 2020, relating to the modification of Ali's timesharing during the school year due to the lack of findings of fact and conclusions of law. On remand, given the passage of time, we leave it to the family court's discretion whether to conduct a supplemental hearing or to make the required findings of fact and conclusions of law from the current record.

Finally, as to Appeal No. 2021-CA-1241-MR, we affirm the family court's orders relating to the designation of the record in their entirety.

GOODWINE, JUDGE, CONCURS.

MAZE, JUDGE, CONCURS IN RESULT ONLY.

| BRIEFS FOR APPELLANT: | BRIEFS FOR APPELLEE: |
|---|---|
| Brandon O. Edwards<br>Louisville, Kentucky | Myrle L. Davis<br>Louisville, Kentucky |

---

[25] We note here that our reversal does *not* prevent Lindsey from filing a properly supported and noticed motion to modify child support.